UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

SHAMEL HARDY,
     a/k/a "Jason Polanco,"

          Defendant.

25 Cr. 94 (LAK)

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT'S MOTIONS TO SUPPRESS AND DISMISS**

JAY CLAYTON
United States Attorney for the
Southern District of New York
26 Federal Plaza
New York, New York 10278

Daniel K. Roque
Special Assistant United States Attorney
   *Of Counsel*

# TABLE OF CONTENTS

Preliminary Statement ..................................................................................................... 1

Facts ................................................................................................................................. 2

Discussion ........................................................................................................................ 4

I.      The Court Should Deny the Motion to Suppress the Gun Found on the Defendant. 6

     A.      Applicable Law ..................................................................................................... 6

     B.      The Officers Had Reasonable Suspicion to Conduct a *Terry* Stop. ...................... 8

     C.      The Defendant's Flight Further Supports the Officers' Reasonable Suspicion to Conduct a *Terry* Stop. ........................................................................................... 12

     D.      The Officers Initial Stop of the Defendant Was Not a Seizure Under the Fourth Amendment. ......................................................................................................... 15

     E.      The Officers' Handcuffing of the Defendant Did Not Convert the *Terry* Stop Into an Arrest. ............................................................................................................. 18

     F.      No Hearing Is Necessary ..................................................................................... 20

II.     The Court Should Deny the Motion to Dismiss.        21

     A.      *Bogle*, *Heller*, and *McDonald* All Confirm the Constitutionality of Section 922(g)(1)'s Prohibition on the Possession of Firearms by Felons. ...................... 21

     B.      Section 922(g) Does Not Violate the Second Amendment as Applied. ............... 22

Conclusion ...................................................................................................................... 23

## Table of Authorities

*Davis v. City of New York*, 902 F. Supp. 2d 405 (S.D.N.Y. 2012) ................................ 22

*District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008) .................................. 26, 27

*Graham v. Connor,* 490 U.S. 386, 109 S. Ct. 1865 (1989) .......................................... 12

*Grice v. McVeigh*, 873 F.3d 162 (2d Cir. 2017) ........................................................ 23

*Illinois v. Wardlow*, 528 U.S. 119, 120 S. Ct. 673 (2000) .......................... 11, 14, 18, 19

*McDonald v. City of Chicago*, 561 U.S. 742, 130 S. Ct. 3020 (2010) .................................. 26, 27

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022).......... 5, 17

*Oliveira v. Mayer,* 23 F.3d 642, 646 (2d Cir. 1994) ................................................. 13

*Posr v. Doherty,* 944 F.2d 91, 98 (2d Cir. 1991) ..................................................... 12

*Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968) ............................................... 11, 12

*United States v. Alexander,* 907 F.2d 269 (2d Cir. 1990) ........................................... 13

*United States v. Arvizu*, 534 U.S. 266, 122 S. Ct. 744 (2002) ..................................... 11

*United States v. Baldwin*, 496 F.3d 215 (2d Cir. 2007) .......................................... 12, 21

*United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013) ........................................ 10, 26, 27

*United States v. Cortez*, 449 U.S. 411, 417 (1981) ................................................. 11

*United States v. Doughty*, No. 08 Cr. 375 (RPP), 2008 WL 4308123 (S.D.N.Y. Sept. 19, 2008)  15

*United States v. Echevarria*, 692 F. Supp. 2d 322 (S.D.N.Y. 2010) ............................... 25

*United States v. Freeman*, 735 F.3d 92 (2d Cir. 2013) .............................................. 19

*United States v. Homer*, 715 F. Supp. 3d 413 (E.D.N.Y. 2024) ................................... 17

*United States v. Huertas*, 864 F.3d 214 (2d Cir. 2017) ............................... 12, 20, 21, 22

*United States v. Jimenez*, 895 F.3d 228 (2d Cir. 2018) .............................................. 27

*United States v. Krubally*, No. 20 Cr. 616 (NSR), 2021 WL 736424 (S.D.N.Y. Feb. 25, 2021) .. 20

*United States v. Krubally*, No. 20 Cr. 616, 2021 WL 2000394 (S.D.N.Y. May 19, 2021) .......... 20

*United States v. Lawes*, 292 F.3d 123, 127 (2d Cir. 2002) ........................................................ 11

*United States v. McCrae*, No. 07 Cr. 772 (JG), 2008 WL 115383 (E.D.N.Y. Jan. 11, 2008) ....... 15

*United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870 (1980)...................................... 21

*United States v. Muhammad*, 463 F.3d 115 (2d Cir. 2006) .................................................... 16, 18

*United States v. Navedo*, 694 F.3d 463 (3d Cir. 2012)............................................................. 19

*United States v. Noble*, No. 07 Cr. 284, (RJS), 2008 WL 140966 (S.D.N.Y. Jan. 11, 2008)........ 25

*United States v. Oates*, 560 F.2d 45 (2d Cir. 1977)................................................................. 11

*United States v. Ortega*, No. 15 Cr. 320 (PAC), 2015 WL 6143758 (S.D.N.Y. Oct. 19, 2015).... 16

*United States v. Perea,* 986 F.2d 633 (2d Cir. 1993).............................................................. 13

*United States v. Place*, 462 U.S. 696 (1983)........................................................................ 11

*United States v. Place*, 462 U.S. 696, 103 S. Ct. 2637 (1983)................................................ 11

*United States v. Simmons*, 560 F.3d 98 (2d Cir. 2009).................................................. 10, 18, 21

*United States v. Stone*, 225 F.3d 647 (2d Cir. 2000) ......................................................... passim

*United States v. Swindle*, 407 F.3d 562 (2d Cir. 2005) .......................................................... 21

*United States v. Torres*, No. 23 Cr. 395 (JGK), 2024 WL 1251186 (S.D.N.Y. Mar. 22, 2024) .... 17

*United States v. Vargas,* 369 F.3d 98 (2d Cir. 2004) ....................................................... 13, 23

*United States v. Villegas*, 928 F.2d 512 (2d Cir. 1991) ........................................................ 11

*United States v. Weaver*, 9 F.4th 129 (2d Cir. 2021) ..................................................... 14, 15, 23

*United States v. Wiggan*, 530 Fed. App'x 51 (2d Cir. 2013)................................................... 24

*United States v. Williams*, 526 Fed. App'x 29 (2d Cir. 2013) .......................................... 11, 15

*United States v. Williams*, 526 Fed. App'x 29, 32 (2d Cir. 2013) ............................................ 10

*Zherka v. Bondi*, No. 22-1108-CV, 2025 WL 1618440 (2d Cir. June 9, 2025)...................... passim

## **PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in opposition to defendant Shamel Hardy's motion to suppress a firearm seized from him on March 16, 2024, and his motion to dismiss the Indictment, which charges him with possessing a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1). *See* Dkts. 12, 19. The defendant's suppression motion should be denied because (1) New York City Police Department ("NYPD") officers had reasonable suspicion to conduct a *Terry* stop of the defendant; (2) the defendant's subsequent flight from those officers serves as an independent basis for the *Terry* stop; and (3) the handcuffing of the defendant, after his flight from police, did not convert the *Terry* stop into an arrest, requiring probable cause.

The Court should also deny the defendant's motion to dismiss the Indictment as meritless. The defendant—who previously has been convicted of at least six felonies—contends that the Second Amendment guarantees him a right to possess a firearm following his felony convictions. The defendant is wrong. The Supreme Court's Second Amendment jurisprudence, including its decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022), makes clear that the Constitution protects only the right of law-abiding citizens to possess guns for lawful purposes. Moreover, the defendant's arguments are now foreclosed by Second Circuit precedent. In *Zherka v. Bondi*, No. 22-1108-CV, 2025 WL 1618440, at *5 (2d Cir. June 9, 2025), the Second Circuit held that the federal prohibition on firearm possession by convicted felons, under 18 U.S.C. § 922(g)(1), is constitutional on its face and that, because it "constitutionally disarms felons as a class," there is no due process right for individuals with felony convictions to make as-applied challenges to the statute based on their particular criminal history. The defendant's Second Amendment arguments, therefore, should be rejected.

## FACTS

On March 16, 2024, four NYPD officers (the "Officers"), including a sergeant, were on patrol in an unmarked police car in the Bronx. Compl. ¶ 3(a). The Officers were patrolling because of recent shootings and violence in that area. *Id.* One officer sat in the rear passenger seat ("Officer-1"), and another sat in the front passenger seat ("Officer-2"). *Id.* At approximately 12:40 a.m., Officer-1 and -2 observed a man, later identified as the defendant, walking in a distinctive manner. *Id.* ¶ 3(b). Officer-1 observed the defendant acting "hyper vigilant," repeatedly "checking behind himself," and, at one point, walking backwards. *Id.* Officer-1 also observed the defendant pass two individuals sitting on a stoop, staring at them while the defendant appeared to jostle his waistband. *Id.*

Based on these observations, at approximately 12:43 a.m., and as is shown on the Officers' BWC footage,[1] the Officers drove up to the defendant and gestured for him to stop. *Id.* ¶ 3(c), (d); *see also* Ex. A (Officer-1 BWC Footage, USAO_0000534), at 0:00-0:59; Ex. D (Officer-2 BWC Footage, USAO_0000533), at 0:00-0:53; Ex. F (Officer-3 BWC Footage, USAO_0000531), at 0:00-0:59. The defendant momentarily paused but "then continued walking." Dkt. 18-9 (Decl. of Shamel Hardy) ¶ 2. The Officers drove up to the defendant again and asked him to stop. Compl. ¶ 3(d). Officer-1 and -2 then got out of their car and walked towards the defendant, who was holding a black plastic bag. *Id.*[2] As Officer-1 and -2 approached the defendant, the defendant extended

---

[1] The conduct in this case was in large part captured on body-worn cameras ("BWC") affixed to NYPD officers who approached and ultimately arrested the defendant after discovering he was in possession of a firearm. The BWC footage from the Officers captured the key events leading to the defendant's arrest and will be cited herein as "BWC Footage" for each officer. In addition to the descriptions below, the Government will provide the Court with access to and/or copies of the BWC Footage for these Officers. The Officers' BWC Footage did not record the audio of their initial request for the defendant to stop because the ability of BWCs to record audio is usually delayed for about one minute from when a BWC is activated.

[2] In his motion, the defendant repeatedly claims that the police "ran" toward him. Dkt. 19, at 2, 3, 8. This is inaccurate; Officer-1's and 2's BWC Footage show that they walked. Ex. A, 0:47-0:56; Ex. D, 0:47-0:55.

both of his arms to hold out the bag. *Id.*; Ex. D, at 0:53-:55. Simultaneously, Officer-1 saw an object in the defendant's waistband. Compl. ¶ 3(d). As shown on Officer-2's BWC Footage, Officer-2 reached for the defendant's bag with his right hand and attempted to place his left hand on the defendant. Ex. B, 1:00-2:11.[3] Before Officer-2 could grab the defendant, *id.*, the defendant fled into the street, crossing against the don't-walk light, while traffic had the green light. Compl. ¶ 3(d); Ex. A, 0:56-1:07.[4] Officer-1's BWC Footage, in slow motion, also shows the split-second interaction between Officer-2 and the defendant before the defendant ran off. Ex. C. Officer-1 and -2 immediately chased the defendant, while the officers in the car, including the driver "Officer-3," drove after the three men. Compl. ¶ 3(e).

The foot chase lasted approximately 15 seconds. Ten seconds into the pursuit, while Officer-2 chased the defendant, Officer-2 placed his right on his holstered gun and yelled out: "He's reaching! He's reaching! I'm a shoot you!" Ex. D, 1:00-1:14; Ex. E (still image of Officer-1). Officer-1 caught up with the defendant first and briefly struggled with him. Ex. A, 1:04-1:20. Moments later, Officer-3 arrived and handcuffed the defendant, Ex. F, 1:00-1:26, while Officer-1 immediately began searching the path of the chase. *Id.* Ex. A, 0:55-2:52. Before the gun was recovered from the defendant, Officer-3 instructed one of the officers where to search for the gun: "Nah, nah, go this way. He was reaching right here, by this car." Ex. F, 1:00-1:08. Officer-3 then explained to the defendant the dangerous situation he had placed himself in by appearing to reach for something during the chase: "Don't fuckin' move bro, all right? You could get yourself killed like that. You're reaching for a gun while running from us. Bro, are you crazy man? Do you wanna fuckin die bro?" *Id.* 1:15-26. Officer-3 then immediately began searching along the route of the

---

[3] Exhibit B is Officer-2's BWC Footage played back at a slower speed.

[4] In his motion, the defendant repeatedly states that officers "grabbed" him. Dkt. 19, at 2, 8, 9, 15. This is inaccurate, as is shown on the BWC Footage.

chase and the surrounding area. *Id.* 1:26-2:03. Officer-2 stayed with the defendant while the other officers conducted the search. Ex. D, 1:53-2:19. Approximately 26 seconds later, Officer-2 began to pat down the defendant's pants, and he found the gun in roughly six seconds at 2:25. *Id.* 2:19-2:25. The defendant was taken into custody. *Id.* 2:25-3:40.

The defendant, who has been convicted of at least six felonies punishable by imprisonment for more than one year, cannot lawfully possess a gun.[5] On December 20, 2024, the defendant was charged by complaint with one count of possessing a firearm after a felony conviction, in violation of § 922(g)(1). Dkt. 1. On March 10, 2025, a grand jury sitting in this District returned an Indictment charging the defendant with the same offense.

On May 10, 2025, the defendant's former counsel moved to suppress the gun and to dismiss the indictment. Dkt. 12. Defense counsel submitted an unsigned declaration for the defendant. On May 27, 2025, the defendant's new counsel filed a supplemental memorandum in support of the motion to suppress, attaching a signed declaration from the defendant, and requesting that the court disregard his prior unsigned declaration. Dkt. 19.

## DISCUSSION

The Court should deny the defendant's suppression motion for three reasons. First, the Officers had reasonable suspicion when they attempted to stop the defendant, late at night in an area where there were recent shootings, after they had observed him walking backwards, "checking behind himself," and jostling his waistband while staring at two individuals on the street. *See United States v. Williams*, 526 Fed. App'x 29, 32 (2d Cir. 2013) (affirming the district court's

---

[5] The defendant's criminal history consists of at least six felonies: (1) June 2004 convictions in South Carolina for larceny, narcotics possession, and breaking into cars or containers where fuel is stored; (2) two August 2006 convictions for the sale or delivery of handgun to and possession by certain persons unlawful; (3) a May 2007 conviction in Bronx County Supreme Court for violating New York Penal Law Section 220.39, Criminal Sale of a Controlled Substance in the Third Degree, for which he was sentenced to 18 months of imprisonment; (4) a January 2014 conviction in this District for violating 21 U.S.C. §§ 846 and 841(b)(1)(C), for which he was sentenced to time served after serving over one year of imprisonment.

finding of reasonable suspicion, in part, because the defendant had swayed back and forth in the middle of the night in a high-crime area); *United States v. Stone*, 225 F.3d 647, *3 (2d Cir. 2000) (finding that the defendant's "awkward gait" served as a factor in support of the seizure). The defendant's suppression motion should be denied on that basis alone.

Second, even setting aside those facts, the Officers had reasonable suspicion to detain the defendant in light of his subsequent flight. As shown on the Officers' BWC footage, although the defendant momentarily stopped in response to the Officers' requests, the defendant then took off, leading the Officers on a chase through the streets of New York, apparently reaching for what the Officers thought was a firearm, and creating a dangerous situation when he collided head on with Officer-1. *See United States v. Simmons*, 560 F.3d 98, 107 (2d Cir. 2009) (noting a suspect's "[f]light in response to an order to stop is relevant to [an analysis of reasonable suspicion] because it precedes the seizure, which occurs when the fleeing suspect is physically apprehended").

Third, the Officers' decision to handcuff the defendant for approximately 44 seconds, after they caught up to him and while they were searching for a firearm, did not transform the defendant's detention into a *de facto* arrest requiring probable cause. Ex. D, 1:41-2:26. Officer-3, who believed that the defendant had attempted to pull out a firearm while fleeing from the Officers, was plainly trying to protect himself, the other Officers, and the public while he and the other Officers conducted a brief investigatory search for that firearm.

Finally, the defendant's motion to dismiss the Indictment should be denied. The Second Circuit has upheld § 922(g)(1) against a facial challenge and determined that defendants are not entitled to bring as-applied challenges to that statute. *See Zherka*, 2025 WL 1618440; *United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013). Accordingly, the Court should deny the motion to dismiss.

## I.    The Court Should Deny the Motion to Suppress the Gun Found on the Defendant.

### A.  Applicable Law

Under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), law enforcement officers can conduct an investigatory stop upon a "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Place*, 462 U.S. 696, 702, 103 S. Ct. 2637, 2642 (1983); *see also, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 675 (2000) (requiring a "reasonable, articulable suspicion that criminal activity is afoot" (citation omitted)). This is "not a high threshold," *United States v. Lawes*, 292 F.3d 123, 127 (2d Cir. 2002)—it is a lenient requirement and "not a difficult one to satisfy." *E.g.*, *United States v. Oates*, 560 F.2d 45, 63 (2d Cir. 1977).

The analysis of reasonable suspicion considers "the totality of the circumstances—the whole picture," *United States v. Sokolow*, 490 U.S. 1, 8, 109 S. Ct. 1581, 1585 (1989) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)), including rational inferences from those circumstances, "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Oates*, 560 F.2d at 61 (internal quotation marks and citations omitted). Individual factors that are "as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991); *see United States v. Arvizu*, 534 U.S. 266, 274-75, 122 S. Ct. 744, 751 (2002). The manner in which a suspect carries himself in the street may, among other factors, support a lawful *Terry* stop. *See Williams*, 526 Fed. App'x at 32 (affirming the district court's finding of reasonable suspicion, in part, because the defendant had swayed back and forth in the middle of the night in a high-crime area); *Stone*, 225 F.3d at *3 (finding that the defendant's "awkward gait" served as a factor in support of the seizure).

"A seizure . . . requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of [police] authority." *United States v. Huertas*, 864 F.3d 214, 216 (2d Cir. 2017) (alterations and ellipsis in original) (internal quotation marks omitted). "Whether conduct constitutes submission to police authority will depend . . . on the totality of the circumstances . . . ." *Id.* (internal quotation marks omitted) (ellipsis in original). "[C]onduct that amount[s] to evasion of police authority is not submission." *Id.* (second alteration in original) (internal quotation marks omitted). When considering whether a suspect's close encounter with an officer amounts to evasion, courts will consider the brevity of the interaction, and the defendant's ability to escape without being detained. *Id.* at 215, 217 (concluding that even flight after an encounter lasting at least 30 to 60 seconds was brief enough to still constituted evasion); *United States v. Baldwin*, 496 F.3d 215, 218 (2d Cir. 2007) ("We hold that, to comply with an order to stop—and thus to become seized—a suspect must do more than halt temporarily; he must submit to police authority, for there is no seizure without actual submission.").

When law enforcement officers make a stop justified by reasonable suspicion, the scope of the stop must be "reasonably related in scope to the justification for their initiation." *Terry,* 392 U.S. at 29, 88 S. Ct. at 1884. Thus, the touchstone in assessing the validity of an investigative stop is the reasonableness of the officer's actions. "Whether a seizure is an arrest, or merely an investigatory detention, depends on the reasonableness of the level of intrusion under the totality of the circumstances." *Posr v. Doherty,* 944 F.2d 91, 98 (2d Cir. 1991). This reasonableness "must be justified from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989). Moreover, "the fact that an investigative stop might, in the abstract, have been accomplished by

some less intrusive means does not, in and of itself, render a stop unreasonable." *United States v. Alexander,* 907 F.2d 269, 273 (2d Cir. 1990).

The Second Circuit has set forth a number of factors relevant to whether an investigative stop was so intrusive as to become a *de facto* arrest. Those factors include the "amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used." *United States v. Perea,* 986 F.2d 633, 645 (2d Cir. 1993) (internal quotation marks and citations omitted). In considering these factors, the Second Circuit has noted that "[n]o single factor" will necessarily convert "a *Terry* stop into a *de facto* arrest," *Oliveira v. Mayer,* 23 F.3d 642, 646 (2d Cir. 1994), and that more intrusive actions, including the use of handcuffs, can be justified in a *Terry* stop when they are "a reasonable response to legitimate safety concerns on the part of the investigating officers." *United States v. Vargas,* 369 F.3d 98, 102 (2d Cir. 2004).

### B. The Officers Had Reasonable Suspicion to Conduct a *Terry* Stop.

The Officers had reasonable suspicion to believe that the defendant was engaging in criminal activity when they first attempted to stop him at approximately 12:43 a.m. on March 16, 2024, based on the following facts, many of which the defendant does not appear to dispute in his motion to suppress:

- The Officers were patrolling the area because of recent shootings and violence.[6] Compl. ¶ 3(a).

---

[6] While the defendant claims there is insufficient evidence in the record to support that the Officers were patrolling a high-crime area, as described further below, he has not disputed that there were recent shootings and violence in the area. Compl. ¶ 3(a).

- The Officers observed the defendant walking in a distinctive manner, specifically, acting "hyper vigilant," repeatedly looking behind himself, and, at one point, walking backwards. Compl. ¶ 3(b); Dkt. 19, at 1.

- Moments later, the Officers drove alongside the defendant and gestured for him to stop, but the defendant ultimately kept walking. Compl. ¶ 3(b); Dkt. 18-9, ¶ 2.

- The Officers then drove up to the defendant again and asked him to stop. Compl. ¶ 3(c).

Put simply, at the time the Officers attempted to stop the defendant on the sidewalk, the defendant was walking and acting suspiciously in the middle of the night in a high-crime area. *Id.* ¶ 3(a), (b). The defendant, without citing any law, simply states that these facts fail to establish reasonable suspicion. *See, e.g.*, Dkt. 19, at 6, 8. He is wrong. The defendant's behavior, coupled with the neighborhood that he was in and the time when he was observed, plainly can serve as the basis for a lawful *Terry* stop. *See, e.g.*, *Wardlow*, 528 U.S. at 124, 120 S. Ct. at 676 ("Our cases have also recognized that *nervous*, evasive behavior is a pertinent factor in determining reasonable suspicion." (emphasis added)); *United States v. Weaver*, 9 F.4th 129, 147-53 (2d Cir. 2021) (finding that the neighborhood's crime rate and the defendant's suspicious movements and "drawn-out look" at a passing car, among other factors, gave the officers reasonable suspicion that the defendant may have been armed and dangerous).

The defendant sets forth several arguments for why the Officers lacked reasonable suspicion. Each of those arguments fails. First, the defendant argues that the Officers' description of the defendant that night merely shows that the defendant may have been "concerned about his own personal safety." Dkt. 19, at 6. But even if that were the most reasonable interpretation of the defendant's behavior, which the Government respectfully submits it is not, the Officers could have lawfully stopped him to determine whether he, at the very least, "needed assistance." *Williams*, 526 Fed. App'x at 32. In *Williams*, the defendant had been "swaying back and forth, in the middle

of the street, at night, in a high-crime area." *Id.* The Second Circuit reasoned that the location, time

of day, and the defendant's behavior weighed in favor of a finding that the officers had reasonable

suspicion to stop the suspect to, among other things, determine whether the individual needed help.

*Id.* at 31, 32.

Second, the defendant argues that a suspect's jostling of his waistband, on its own, does

not create reasonable suspicion. Dkt. 19, at 7-8 (citing or discussing *United States v. Doughty*, No.

08 Cr. 375 (RPP), 2008 WL 4308123 (S.D.N.Y. Sept. 19, 2008); *United States v. McCrae*, No. 07

Cr. 772 (JG), 2008 WL 115383 (E.D.N.Y. Jan. 11, 2008); *Weaver*, 9 F.4th 129).[7] But, as discussed

above, the defendant's adjustment of his waistband while he stared down others on a stoop was

only one factor, among others, that supported the Officers' decision to conduct a *Terry* stop. Compl.

¶ 3(b); Dkt. 19, at 1, 6, 7, 8. Indeed, in *Weaver*, the Second Circuit, *en banc*, vacated a panel

decision and affirmed the district court's denial of a suppression motion, noting, in part, that an

officer reasonably suspected that the suspect had a dangerous item in his waistband area because

of the suspect's movements, "in relatively quick succession," involving his waistband area. 9 F.4th

at 147. Like *Weaver*, Hardy's suspicious behaviors occurred in a span of seconds. Compl. ¶ 3(b).

Third, the defendant claims that the record does not support that the stop was based, in part,

on the neighborhood and its crime rate. Dkt. 19, at 6 ("None of the officers stated in their arrest

paperwork or during grand jury testimony . . . that Mr. Hardy was walking in an area known for

---

[7] The defendant specifically cites *Doughty* for the principle that "an officer's 'impression of how [the *defendant*] looked adjusting his weapon, without more, is insufficient grounds to provide "reasonable suspicion" of criminal activity.'" Dkt. 1, at 19 (emphasis added) (citation omitted). This may be a misreading of *Doughty* as the court was likely merely stating that the officer's impression of how *he, the officer*, not the defendant, "looked adjusting his [the officer's] weapon" was not sufficient on its own to establish reasonable suspicion. 2008 WL 4308123, at *6. That the officer relied on his own personal experience (instead of professional experience or training) was key to the court granting the suppression motion. Regardless, here, as discussed above, the defendant engaged in a number of other objective, suspicious movements, namely, walking backwards and looking over his shoulder. This is also in stark contrast to the court in *McRrae* that found the defendant was not engaging in any suspicious movements. 2008 WL 115383, at *4.

high rates of shooting or gun arrests."). The Complaint alleges, and the Government expects that the Officers would testify, that the Officers were "patrolling that area because of recent shootings and violence." Compl. ¶ 3(a). Normally, an area's high crime rate is one factor that contributes to a finding of reasonable suspicion. *United States v. Muhammad*, 463 F.3d 115, 122-23 (2d Cir. 2006). That is particularly true where, as here, there were specific, recent crimes in the neighborhood the Officers were patrolling. *United States v. Ortega*, No. 15 Cr. 320 (PAC), 2015 WL 6143758, *3 (S.D.N.Y. Oct. 19, 2015) ("Defendants assert that 'no specific and articulable facts about the location of the traffic stop . . . indicated a threat to the officers' safety.' [The] Officer . . . testified—based on his personal experience in the precinct and crime reports he had read—that the area was a high-crime neighborhood. . . . That fact alone bespeaks caution." (first ellipsis in original)).

Finally, while the defendant disputes that any of the Officers saw a bulge on the defendant's right side, Dkt. 19, at 9, there is of course no requirement that the Officers make such an observation to support a lawful *Terry* stop. *See, e.g., Stone*, 225 F.3d at *2 (reasonable suspicion without officers observing a bulge). The defendant argues that a bulge was not visible to the Officers for two reasons. First, the defendant argues that still images of the defendant from BWC Footage and a bodega's surveillance camera purportedly taken at approximately 12:16 a.m. reveal no bulge on his person. Dkt. 19, at 10. Those images, however, do not clearly show the defendant's waistband. The defendant also claims that BWC Footage shows that, while the Officers chased the defendant, his arms did not seem to move the gun from his waistband to his leg, *id.*, despite the Officers' assertions that he appeared to be reaching for a firearm. The BWC Footage does not support the defendant's assertions. To the contrary, the Government expects that at least one of the Officers would testify that they saw an object in the defendant's waistband prior to his seizure.

11

While that fact is not necessary to this Court's analysis, it is yet another reason why the Officers' ultimate decision to detain the defendant while they searched for a firearm was reasonable.

The defendant, citing *United States v. Homer*, 715 F. Supp. 3d 413 (E.D.N.Y. 2024), argues that even if officers did see a bulge on his person, the bulge did not provide the Officers with reasonable suspicion as a result of the Supreme Court's decision in *Bruen*. *Bruen* struck down certain restrictions in New York for possessing a gun. *Bruen*, 597 U.S. at 12, 142 S. Ct. at 2122-23. The court in *Homer* found that the police lacked probable cause to arrest a suspect, rejecting the Government's argument that any person with a gun may be arrested. 715 F. Supp. 3d at 418. This ruling, however, did not extend to an analysis of *Terry* stops; indeed, the court explicitly noted that "[e]ven after *Bruen*, police officers have reasonable suspicion to justify a *Terry* stop when seeing someone they suspect has a gun." *Id.* at 422. And even if the Court were to consider *Homer*'s effect on a probable-cause analysis, at least one court in this District does not agree that *Bruen* had the consequential effects *Homer* suggests. *United States v. Torres*, No. 23 Cr. 395 (JGK), 2024 WL 1251186, at *9 (S.D.N.Y. Mar. 22, 2024) ("[T]here is nothing in *Bruen* that alters the well-established law in this Circuit that the possession of a firearm provides probable cause to arrest."). In sum, the Officers had sufficient grounds when they initially attempted to stop the defendant based on, among other factors, the time of day, the recent shootings in the neighborhood, and the defendant's nervous movements.

### C.  The Defendant's Flight Further Supports the Officers' Reasonable Suspicion to Conduct a *Terry* Stop.

Moreover, the defendant fled from the Officers after they initially asked him to stop. The defendant's flight further supports the lawfulness of the defendant's ultimate seizure. *Muhammad*, 463 at 121 ("When the noticed presence of officers provokes a suspect's headlong flight in a high crime area, the officers are justified in suspecting criminal activity on the part of the suspect and a

*Terry* stop is warranted."); *see Stone*, 225 F.3d at *4 (finding stop was lawful where, as here, defendant had "awkward gait," repeatedly touched or adjusted object in front pocket, was initially stopped in area with recent increase in violent crime, and then took flight). In *Wardlow*, for example, the Supreme Court found that an area's high crime rate and the defendant's "unprovoked flight upon noticing the police" constituted a lawful basis for a *Terry* stop, reasoning that flight "is certainly suggestive of [wrongdoing]" and "the consummate act of evasion." 528 U.S. at 124, 120 S. Ct. at 674. As a result, the Court concluded that "[a]llowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or stay put and remain silent in the face of police questioning." *Id.* at 125, 120 S. Ct. at 676; *Muhammad*, 463 F.3d at 122-23 ("[P]ersonal observations made by the officers that corroborate information furnished by an unknown and unaccountable tipster may provide the basis for a reasonableness finding. Such corroboration may come in the form of an officer's observation of flight in a high crime area.").

That is true even when, as here, the defendant's flight took place after he was first told to stop. *See Simmons*, 560 F.3d at 106 (noting that where "the suspect attempts to flee from police after being ordered to stop . . . the grounds for a stop may . . . be based on events that occur after the order to stop is given," including a suspect's flight from the police). Here, the BWC Footage clearly shows that almost immediately after the defendant was ordered to stop, he fled. Ex. A, 0:30-0:57. Indeed, at the moment the police approached the defendant, he began to sprint away from the Officers without regard to his safety, dashing out into the street against the don't-walk sign as a car approached. Compl. ¶ 3(d); Ex. A, 0:56-1:07. Thus, the defendant's flight is a proper ground to support a finding of reasonable suspicion.

The defendant appears to make three arguments as to why his flight is not an appropriate factor for this Court to consider. First, the defendant asserts that his flight was consistent with a suspect's right to ignore officers attempting to conduct a *Terry* stop. Dkt. 19, at 11-12 (citing *United States v. Navedo*, 694 F.3d 463 (3d Cir. 2012); *United States v. Freeman*, 735 F.3d 92 (2d Cir. 2013)). The defendant cites to the Third Circuit's decision in *Navedo* and the Second Circuit's decision in *Freeman* in support of his argument. But neither case provides any legal support for the defendant. Relying on *Navedo*, the defendant argues that a suspect's flight alone does not create probable cause for an arrest. Dkt. 19, at 11-12. In *Navedo*, in an area not known for its crime, officers were conducting surveillance because of a recent shooting unconnected to the suspect. 694 F.3d at 465. The officers witnessed the suspect look at a gun someone else had taken out of a bag and thereafter chased the suspect into his home, where the suspect possessed unlawful weapons, forming the basis for his arrest. *Id.* at 466-67. The Third Circuit reversed the district court's denial of the suppression motion, holding that flight alone did not amount to probable cause, justifying an arrest. *Id.* at 474. But the issue in this motion, however, is whether the police had reasonable suspicion for a *Terry* stop, not probable cause for an arrest. In *Freeman*, the Second Circuit reversed a denial of a suppression motion, finding that the NYPD lacked reasonable suspicion, in part, because the defendant in that case, unlike Hardy, did not flee, break away, or try to run before he was stopped. *See* 735 F.3d at 95, 96, 101. Thus, these cases are inapplicable.

Next, the defendant relies on a handful of cases from outside this District to argue that flight does not necessarily mean an individual is engaging in criminal activity. Dkt. 19, 12-13. That principle has been well recognized. *See Wardlow*, 528 U.S. at 125, 120 S. Ct. at 677 (acknowledging there may be innocent reasons for a person to flee the police and "flight is not necessarily indicative of ongoing criminal activity."). Here, however, there are additional factors

present, such as the time of day and the defendant's movements during the chase. The defendant

cites to one case from this District in support of his position. *United States v. Krubally*, No. 20 Cr.

616 (NSR), 2021 WL 736424 (S.D.N.Y. Feb. 25, 2021). In *Krubally*, the court denied the

defendant's suppression motion where the defendant fled on foot from officers after they used their

unmarked police car to block in a parked car in which the defendant sat as a passenger; the police

took that action to investigate the potential use of marijuana. *United States v. Krubally*, No. 20 Cr.

616, 2021 WL 2000394, at \*1-2 (S.D.N.Y. May 19, 2021). The court noted that if there had been

evidence that the police had initiated the chase and the suspect did not know that it was the police

pursuing him, the suspect's flight would not have supported the police's reasonable suspicion to

stop the suspect. *Id.* at \*5 n.3. Those circumstances are far different from the ones presented here.

As shown on the BWC Footage, approximately seven seconds after Officer-2 got out of his vehicle

and approached the defendant, the defendant fled from the Officers. Ex. B, 0:49-0:56. The Officers,

who were wearing their NYPD uniforms, were plainly identifiable as NYPD, and they did not

initiate the chase. Ex. D, 0:48-0:56 (defendant fled), 3:12-17 (in uniforms); Ex. A, 3:26-34 (in

uniforms). The defendant did.

### D. The Officers' Request that the Defendant Stop Was Not a Seizure Under the Fourth Amendment.

The Officers' initial request that the defendant stop to speak with them, and the defendant's

momentary compliance with their directive, does not constitute a seizure. A "seizure . . . requires

*either* physical force . . . *or*, where[, as in this case,] that is absent, *submission* to the assertion of

[police] authority." *Huertas*, 864 F.3d at 216 (ellipsis and second alteration in original) (citations

omitted). A police officer's order to stop constitutes a seizure if "a reasonable person would have

believed that he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct.

1870, 1877 (1980), and the person complies with the officer's order to stop. *United States v.*

*Swindle*, 407 F.3d 562, 572 (2d Cir. 2005).  A suspect is not seized, however, when he "halt[s] temporarily" in response to an order to stop and then flees. *Baldwin*, 496 F.3d at 218. Instead, when a defendant flees from the police, "the seizure . . . occurs when the fleeing suspect is physically apprehended." *Simmons*, 560 F.3d 98 at 107.

Moreover, "conduct that 'amount[s] to evasion of police authority' is 'not submission.'" *Huertas*, 864 F.3d at 216 (alteration in original) (citation omitted). In *Huertas*, the defendant argued that he had submitted to police authority when he answered an officer's questions for approximately 30 to 60 seconds, while he stood on a street corner and the officer sat in his police car. *Id.* at 215, 216-17. But the Second Circuit disagreed, finding that the defendant had engaged in evasive conduct despite the defendant's brief consensual interaction with the officer, because the defendant had fled after the officer stepped out of the police car. *Id.* at 215, 217. The court pointed out that by "remaining still and answering questions," the defendant engaged in evasive conduct because he may have persuaded the officer to end the encounter. *Id.* at 217. The court also factored in the "brevity of the interaction" and the fact that the officer could not reach the defendant to restrain him. *Id.* at 217. For all of these reasons, the court found that the defendant had not submitted to police authority because he had evaded the officer.

Similarly, in *Stone*, 225 F.3d 647, *3, the Second Circuit noted that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." The Second Circuit affirmed the district court's determination that a lawful *Terry* stop had occurred because "the police officers' initial encounter with [the defendant] [w]as a consensual one. And, given that [c]onsensual encounters require no justification so long as the police do not convey a message that compliance with their requests is required, the officers' interaction with [the defendant] while they were still inside the unmarked police car raises no Fourth Amendment

problems." *Id.* (second alteration in original) (citations and internal quotation marks omitted)). In *Stone*, the officers called out to the suspect to ask how he was doing, and, in response, the suspect answered that he was heading home but then fled before the police got out of their car. *Id.* at *1.

As in *Huertas* and *Stone*, Hardy's initial decision to momentarily stop or briefly acknowledge the Officers' presence before fleeing does not transform his momentary pause into a seizure. Moreover, the BWC Footage demonstrates that Hardy's seeming initial compliance was in fact evasive conduct. As Officer-1 and -2 exited their car, Hardy remained still and offered up a bag. *E.g.*, Ex. A, 0:30-57. When Officer-2 reached for the bag with his right hand, Hardy used that opportunity to begin sprinting, running out of the reach of Officer-2's left hand. Ex. B, 1:00-2:11; Ex. C. These facts show that Hardy did not submit to authority, engaged in evasive conduct, and was only seized when the Officers detained him 15 seconds later. Ex. D, 0:48-1:14. This is almost precisely the evasion envisioned by *Huertas*. 864 F.3d at 218 ("Subject to the specific circumstances of each case, submission is questionable when a suspect remains out of reach and takes flight when police move to lay hands on him.").

The defendant argues, however, that he was seized when he complied with the Officers' requests to stop before he fled.[8] Dkt. 19 at 8, 14-15. But the defendant does not appear to dispute that he only stopped briefly after the Officer's first request. *See, e.g.*, Dkt. 18-9, at ¶ 2 ("Police officers drove alongside me, told me to stop and I did. I then continued walking."); *see also* Compl. ¶ 3(c) ("[T]he police vehicle drove up to where Hardy was walking, and the officers inside the vehicle gestured at the man to stop, and told Hardy they were police officers. Hardy stopped for a

---

[8] In support of this argument, the defendant cites *Davis v. City of New York*, 902 F. Supp. 2d 405 (S.D.N.Y. 2012). There, a non-tenant of a NYCHA building was in the lobby of the building, walking towards an elevator when an officer on patrol directed her to "come back" and she stopped walking. *Id.* at 422-23, 428. Relying on *Simmons*, the court found that the non-tenant obeyed the order and was thus seized. *Id.* at 428 & n.128. Importantly, *Simmons* lays out *two* ways in which a seizure occurs: "(1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained." 560 F.3d at 105. Unlike in *Davis*, where the non-tenant complied with the directive and did not flee from the police, Hardy took off and ran into the street.

moment, did not respond, and kept walking."). The defendant instead claims that the Officers "ordered him to 'stop' then proceeded to *run* out of their car, *surround* him and *grab* him." Dkt. 19, at 8, 15 (emphasis added). But the videos from Officer-1's and -2's BWC Footage shows that *none* of this actually happened. Instead, the BWC Footage shows that Officer-1 and -2 got out of their car and walked over to the defendant. Ex. A, 0:44-0:56; Ex. D, 0:44-0:56. The defendant was not, as he claims, surrounded by officers. And a close examination of the videos in slow motion shows that no one grabbed the defendant because he started sprinting out into the street. Ex. B, 1:00-2:11; Ex. C. Thus, the defendant evaded the Officers and was not seized until the Officers caught up with him approximately 15 seconds later. This initial encounter did not constitute a seizure.

### E. The Officers' Handcuffing of the Defendant Did Not Convert the *Terry* Stop into an Arrest.

Finally, the mere fact that one of the Officers placed the defendant in handcuffs after catching up with him does not transform the defendant's detention into an arrest requiring probable cause.  Courts in the Second Circuit have consistently recognized that when a suspect is fleeing, it is reasonable to use force in order to effectuate a *Terry* stop. *See, e.g.*, *Vargas*, 369 F.3d at 102 (holding that placing the defendant on the ground and handcuffing him was appropriate because it was "'a reasonable response to legitimate safety concerns on the part of the investigating officers'" (citation omitted)); *Weaver*, 8 F.3d at 1244 (affirming determination that it was proper for police to effectuate a *Terry* stop of a fleeing suspect by tackling him); *see also Grice v. McVeigh*, 873 F.3d 162, 168 (2d Cir. 2017) ("handcuffing a potentially armed suspect to search him for a firearm was not an arrest" (quoting *United States v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004))).

Here, once the defendant saw the NYPD, he almost immediately fled from them. This flight occurred after the Officers had observed, among other things, the defendant jostling his waistband

while looking at two individuals and walking suspiciously in a high-crime neighborhood late at night. The officers' excited utterances, during the chase and then before the gun was recovered, leave no doubt that they believed the defendant was armed and dangerous. Ten seconds into the chase, Officer-2, with his hand on his own holstered gun, appeared ready to draw his weapon as he yelled out: "He's reaching! He's reaching! I'm a shoot you!" Ex. D, 1:00-1:14; Ex. E. Officer-1 then caught up to the defendant, withstood the defendant's collision, and briefly struggled with him. Ex. A, 0:55-2:52. Officer-3 arrived and assisted in the detention of the defendant and handcuffed him, but, before the gun was recovered, Officer-3 instructed another officer on the scene: "Nah, nah, go this way. He was reaching right here, by this car." Ex. F, 1:00-1:08. Again, before the recovery of the gun, Officer-3 warned the defendant about his reckless behavior during the chase: "You could get yourself killed like that. You're reaching for a gun while running from us. Bro, are you crazy man? Do you wanna fuckin die bro? The defendant remained handcuffed for less than one minute until the gun was found in his pants. Ex. D, 1:40-2:26; Ex. F, 1:15-26; Ex. D, 1:53-2:25; *see United States v. Wiggan*, 530 Fed. App'x 51, 55 (2d Cir. 2013) (summary order) (holding that a stop did not become an arrest because officers did not draw their guns and observed an apparent firearm on the suspect during an altercation that lasted only a few seconds).

At a minimum, Officer-2 and -3 believed the defendant was armed after the defendant's unprovoked flight. Notably, the defendant did not immediately give himself up when the Officers caught up with him and instead ran head on into Officer-2, creating a highly dangerous situation because he had an un-holstered gun that had obviously fallen down to his thigh area. No officer drew his weapon, and the defendant was only handcuffed for approximately 46 seconds before the gun was found. Ex. D, 1:40-2:26. *See United States v. Echevarria*, 692 F. Supp. 2d 322, 334 n.5 (S.D.N.Y. 2010) ("[T]he brief use of handcuffs during a *Terry* stop does not elevate a *Terry* stop to

an arrest, nor is an officer prohibited from using handcuffs when faced with a *Terry* stop subject who indicates a desire to leave, and attempts to do so, before the officer has completed the stop, especially when the stop is of short duration."). After that, it took roughly 27 seconds to remove the gun from the defendant's pants. Ex. D, 2:26-2:53. From there, he was immediately placed in the unmarked car and taken to the police station. Because there was reasonable suspicion to seize the defendant in order to conduct a *Terry* stop, and because the level of force used by the Officers was reasonable under the circumstances, the use of handcuffs did not transform the *Terry* stop into a *de facto* arrest.

**F.  No Hearing Is Necessary.**

The Court should deny the suppression motion without an evidentiary hearing. "A defendant is entitled to an evidentiary hearing on a motion to suppress only if the defendant establishes a contested issue of material fact." *United States v. Noble*, No. 07 Cr. 284, (RJS), 2008 WL 140966, at *1 (S.D.N.Y. Jan. 11, 2008) (citing *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992)). Here, the defendant has not disputed the following:

- At approximately 12:43 a.m., the Officers were patrolling the area because of recent shootings and violence. Compl. ¶ 3(a).

- The Officers observed the defendant "checking behind himself," and, at one point, walking backwards. Compl. ¶ 3(b); Dkt. 19, at 1.

- Moments later, the Officers drove alongside the defendant and gestured at him to stop but the defendant ultimately did not comply. Compl. ¶ 3(b); Dkt. 18-9.

- The Officers again drove up to the defendant and asked him to stop. Compl. ¶ 3(c); *see* Ex. A, 0:52.

- Officer-1 and -2 exited their car to address the defendant, who was holding a black plastic bag. Compl. ¶ 3(d).

- As Officer-1 and -2 walked towards the defendant, the defendant held out the bag. *Id.* ¶ 3(d).

20

- As the defendant held out the bag, he then immediately fled into the street before Officer-2 could grab him. *Id.*; Ex. A, 0:56-1:07.

All of these facts provided the Officers with reasonable suspicion to stop the defendant. But even setting aside these facts, the Officers' BWC Footage plainly supports the lawfulness of the Officers' seizure of the defendant after he took flight and the Officers believed that the defendant was reaching for what appeared to be a firearm.

## II. The Court Should Deny the Motion to Dismiss.

The defendant moves to dismiss the Indictment on the theory that his possession of a firearm is protected by the Second Amendment and that § 922(g)(1) is unconstitutional both facially and as applied to him, under the Supreme Court's decision in *Bruen*. Dkt. 12, at 6-9. The Court should reject those arguments. The Second Circuit recently upheld § 922(g)(1) against facial and as-applied challenges, a decision that *Bruen* does nothing to undermine. *See Zherka*, 2025 WL 1618440, at *5; *Bogle*, 717 F.3d 281. Accordingly, the Court should deny the motion to dismiss.

### A. *Bogle*, *Heller*, and *McDonald* All Confirm the Constitutionality of Section 922(g)(1)'s Prohibition on the Possession of Firearms by Felons.

The Supreme Court has repeatedly held that its decisions interpreting the Second Amendment "d[o] not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786, 130 S. Ct. 3020 (2010) (plurality) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S. Ct. 2783, 2816 (2008)); *see also Bruen*, 142 S. Ct. at 2162.

In *Heller*, the Supreme Court held that the Second Amendment protects "the right of *law-abiding*, responsible citizens" to possess a handgun in the home for self-defense. 554 U.S. at 635, 128 S. Ct. at 2821 (emphasis added). The Court emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by

felons." *Id.* at 626. Two years later, the Supreme Court extended *Heller* to state and local governments, while "repeat[ing] [the] assurances" that it "made . . . clear" in *Heller* that its "holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald*, 561 U.S. at 786, 130 S. Ct. at 3047 (plurality) (quoting *Heller*, 554 U.S. at 626).

The Second Circuit has likewise held, following *Heller* and *McDonald*, that § 922(g)(1) is constitutional under the Supreme Court's Second Amendment jurisprudence. *Bogle*, 717 F.3d at 282–83. Expressly incorporating the Supreme Court's discussions ratifying "longstanding prohibitions on the possession of firearms by felons," the Second Circuit held that § 922(g)(1) "is a constitutional restriction on the Second Amendment rights of convicted felons." *Id.* at 281–82. The Second Circuit has, since *Bogle*, continued to cite it as good law and recently held that its "holding in *Bogle* survives *Bruen*." *See, e.g., Zherka*, 2025 WL 1618440, at *5; *United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018).

### B.  Section 922(g) Does Not Violate the Second Amendment as Applied.

The defendant also asserts an as-applied challenge, Dkt. 12, at 6, which is similarly meritless. The defendant appears to argue that § 922(g)(1) is unconstitutional as applied to him because the Officers had no basis to determine that he was dangerous. Dkt. 12, at 9. This seems to repeat the argument above that the Officers lacked a reasonable suspicion to stop and search the defendant. For the reasons already discussed above, that argument should be rejected.

To the extent the defendant is suggesting that § 922(g)(1) is unconstitutional as applied to him because he is a "nonviolent felon," the prohibition on possession of firearms by convicted felons does not violate the Second Amendment as applied to "nonviolent" felons. *Zherka*, 2025 WL 1618440, at *22. In *Zherka*, the Second Circuit rejected the argument that § 922(g)(1) is

unconstitutionally broad because it allows no exception for nonviolent felons. *Id.* at *18-19. To support this finding, the Second Circuit identified historical analogous statutes, like § 922(g)(1), that "disarmed whole classes of individuals based on a status that the legislature perceived as dangerous." *Id.* *19. Moreover, the Second Circuit has confirmed that because § 922(g)(1) "constitutionally disarms felons as a class," there is no due process right for individuals with felony convictions to seek individualized relief from the categorical ban based on their particular criminal history or circumstances. *Zherka*, 2025 WL 1618440, at *22.

## **CONCLUSION**

For the foregoing reasons, this Court should deny the defendant's motion to suppress and the defendant's motion to dismiss the Indictment as meritless.

Dated: New York, New York
        June 10, 2025

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney


                          By:    s/ Daniel Roque
                                 Daniel Roque
                                 Special Assistant United States Attorney
                                 (212) 637-1946