UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                                                    25 Cr. 94 (S.D.N.Y.) (LAK)

    - v. -

   -
SHAMEL HARDY
                Defendant.
------------------------------------------------------------X

# DEFENDANT'S REPLY IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE

Megan Wolfe Benett, Esq.
485 Lexington Ave., 28th Floor
New York, NY 10017
(212) 973-3406
(212) 972-9432 (fax)
mbenett@kreindler.com
*Attorney for Defendant Shamel Hardy*

June 18, 2025

1. **Defendant was Seized at the Time he Complied with the Police Command to Stop**

The government argues that Mr. Hardy was not seized for Fourth Amendment purposes after he complied with the NYPD officers' directive to stop walking and he waited with his arms out. Government Opposition (Gov. Opp.) at 15-18. That is wrong.

Four NYPD officers shadowed Shamel Hardy in an unmarked car as he walked home from work on a public street, after waiting for a bus. *See* Supplemental Hardy Declaration (Supp. Hardy Decl.), Defense Exhibit K, at ¶¶ 1, 1(a).[1] As Det. Joseph testified, the NYPD officers directed Mr. Hardy to stop two times (Def. Exh. B at ¶ 3.c-d), and as officers opened their car doors, Mr. Hardy "extended his … arms out in front of him, extending the bag toward the officers." Def. Exh. A at 10:12-15. After being told by police to stop twice, Mr. Hardy did so, submitting to police authority by ceasing to walk, turning to them and holding out his arms and bag as they opened the car doors. He was seized for Fourth Amendment purposes at that point.

The "threatening presence of several officers" and "use of language or tone of voice indicating that compliance with the officer's request might be compelled" are textbook indicia of a seizure. *U.S. v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870. 1877 (1980). Multiple officers were present; they tell Mr. Hardy repeatedly to stop; they stop their vehicle and two officers exit to begin to approach him; Mr. Hardy remains standing still, holding out his hands and his bag; and, as Mr. Hardy states, he did not feel as though he was free to leave. Def. Exh. K at ¶5. This is more than sufficient to establish a Fourth Amendment seizure. *U.S. v. Simmons*, 560 F.3d 98, 106 (2009) (defendant was seized "the moment that he complied with the second order to stop"). Contrary to the government's assertion, Mr. Hardy complied with the showing of police authority and was seized when he stopped

---

[1] In fact, a bus – likely the one for which Mr. Hardy had been waiting before giving up and starting to walk – can be seen in some of the body camera footage. *See* Def. Exh. C at 00:26-00:30. Some of the conduct the officers describe as a "little odd" such as Mr. Hardy "looking over his shoulders" and "checking behind himself" ((Def. Exh. A at 8:2-3, Exh. B at ¶ 3b), is consistent with a person checking for a bus for which he has been waiting.

1

walking. *See U.S. v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) ("A seizure triggering the protection of the Fourth Amendment occurs once an officer has 'by means of physical force or show of authority, ... in some way restrained the liberty of a citizen'" (quoting *Terry v. Ohio*, 392 U.S. 1, 20 fn 16, 88 S.Ct. 1868, 1879 fn 16 (1968)).

The cases upon which the government relies in arguing that the police "request" to stop was not a seizure are inapposite.[2] Unlike the defendant in *Huertas*, Mr. Hardy did not run "as soon as [he] saw [the officers] getting out of [their] car." *U.S. v. Huertas*, 864 F.3d 214, 217 (2d Cir. 2017) (no seizure during brief interaction.) Coming to a complete stop, facing the police and remaining standing, arms stretched out and bag held in front of him even as the police exit their vehicle, demonstrates a submission to police authority and a restraint on Mr. Hardy's liberty in a way that distinguishes this case from *Huertas*.

Similarly unhelpful to the government is *U.S. v. Stone*, 225 F.3d 647 (2d Cir. 2000). There, the Second Circuit held that the defendant was not seized during an initial police interaction during which one officer stated from his car's open window to the defendant, who was walking, "How are you doing? Police" and did not tell the defendant to stop. *Id.* at *1. The defendant said he was "just going home" and immediately fled, before officers exited their vehicle. *Id.* Here, on the other hand, Mr. Hardy was told to stop, did stop, turned to the police with his arms out, and remained standing as the police exited their car.[3]

Once Mr. Hardy submitted to the demonstration of police authority he was seized and the officers must have had reasonable suspicion *prior* to that – irrespective of any subsequent observations or

---

[2] The government says the officers "requested" Mr. Hardy stop; Mr. Hardy recalls they "ordered" him to stop. Def. Exh. I at ¶ 3. He also states that he "did not believe that [he] was free to leave." Def. Exh. K at ¶ 5. The camera footage has no audio at that point and none of the officers' statements describe their tone or volume. This Court should accept Mr. Hardy's description of how the police told him to stop and his reaction or else order an evidentiary hearing.

[3] The government conflates the two times Mr. Hardy stopped. Gov. Opp. at 17. He stopped briefly then continued walking before coming to a complete stop. Def. Exh. B at ¶ 3.c-d; Def. Exh. I at ¶¶ 2-3.

flight – to justify the stop. At that point the only facts specific to Mr. Hardy supporting the stop were: (1) how he was walking and (2) his purported waistband adjustment which, as discussed below, did not amount to reasonable suspicion.[4]

Even if Mr. Hardy was not seized at that point, he certainly was when the officers made physical contact with him which, while not necessary for a Fourth Amendment seizure, is another convincing factor demonstrating the restraint on a citizen's liberty that must be supported by reasonable suspicion. *Mendenhall*, 446 U.S. at 554 (indication of seizure is "some physical touching of the person of the citizen"); *Huertas*, 864 F.3d at 217 (no seizure in part because officers were not "within reach" of the defendant or "able to physically restrain him."). At the point at which the two officers are to either side of Mr. Hardy, one of the officers physically reaches out and makes contact with Mr. Hardy.[5] When the officer reaches out to grab Mr. Hardy, the only additional fact is then purported observation of a "bulge" in Mr. Hardy's pants, which, as discussed below, did not provide reasonable suspicion to stop him.

In no event can the stop reasonably be pushed to sometime after Mr. Hardy runs, given his clear submission to the earlier show of police authority. "The government likely seeks to push the moment of the seizure forward in time in order to reap the benefits" of those decisions relying on flight to

---

[4] Late at night and walking home alone, Mr. Hardy was followed by an unmarked car then approached by NYPD officers who, he believed, had no basis to stop him. It was only after one of the officers made physical contact with Mr. Hardy that he ran. Under those circumstances, a reasonable person could have been provoked to run, fearing that the police interaction might be nefarious. *U.S. v. Krubally*, No. 20 CR 616 (NSR), 2021 WL 2000394, at *5 fn 6 (S.D.N.Y. May 19, 2021); *see also Wong Sun v. U.S.*, 371 U.S. 471, 482, 83 S.Ct. 407, 414 (1963) (defendant's flight after finding narcotics agent unexpectedly at his door is "ambiguous conduct" that was provoked by officer "insufficiently or unclearly identif[ying] his office of his mission."). The government appears to misunderstand this argument as Mr. Hardy having been concerned about his safety because of the surroundings (Gov. Opp. at 9) and thus needing police assistance. But the police did not know he was scared and it is precisely the ambiguous police conduct that could have provoked his flight. In any event, even if the police initially called out to Mr. Hardy because they thought he needed assistance (for which there is no evidence), when he kept walking the initial time it should have been clear that he did not need or want *their* assistance.

[5] The government disputes there was a "grab" but the arresting officer described his partner as going to "grab" Mr. Hardy. Defense Exhibit L ("As P goes to grab D, D then takes off … .")

3

justify a stop. *Freeman*, 735 F.3d at 96 (citing cases); *Simmons*, 560 F.3d at 107 ("Flight in response to an order to stop is relevant to the reasonableness of a stop because it *precedes* the seizure … ) (emphasis added). But that line of cases involve defendants who fled *before* seizure – whereas here, Mr. Hardy was seized prior to running, and any post-stop flight cannot be used to cure the taint of the original stop.

2. **At the Time of the Initial Stop the Officers Could Not Have Reasonably Suspected that Mr. Hardy Had Committed a Crime or was Armed and Dangerous**

At the time of the stop (prior to flight), the officers' observations of Mr. Hardy consisted of: (1) his manner while walking (Def. Exh. A 7:25-8:9); (2) the purported waistband "adjustment" or "jostling" (Def. Exh. H at 2; Def. Exh. B at ¶ 3b); and (3) (only after Mr. Hardy submitted to police authority) a "bulge" in Mr. Hardy's "right-hand side" (Def. Exh. A at 11:11-13). Contrary to the government's suggestion, Mr. Hardy challenges the statements regarding adjusting or jostling his waist band (Def. Exh. K at 2) and the visibility of a bulge (Def. Supp. Motion to Suppress at 10; Def. Exh. K at 1).

**Waistband Adjustment:** Prior to telling him to stop and Mr. Hardy submitting to police authority (stopping, facing the officers, holding out his arms and bag as they exited their car), the police only saw Mr. Hardy walking in a manner they found unusual and observed him "adjusting his waistband." Def. Exh. A at 8:7. Adjusting or jostling his waistband, which is contested (Def. Exh. K at ¶ 2), taken in context here, was not a basis for the stop, even when combined with Mr. Hardy's demeanor while walking. Officers stated only that they found the waistband adjustment "interesting" (Def. Exh. M at 6:1-2) and "a little odd" (Def. Exh. A at 8:7-9) – *not* that they believed he was adjusting his waistband because he was carrying a firearm. *U.S. v. Doughty*, 08-cr-375 (S.D.N.Y.) (RPP), ECF 27-2 at 11 (mere adjustment of waistband "without more" suggestion that waistband contained firearm does not amount to reasonable suspicion.) Unlike in other cases where observations of objects in waistbands have justified a stop, the officers here did not see something

4

that appeared weighty or looked like the outline of a gun prior to the stop. *U.S. v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008) (where detective observed defendant "reach underneath his jacket and shirt and adjust a weighty object concealed at the center of his waistline," … "[e]ven if the gesture were consistent with conceivable innocuous adjustments, its 'distinctive' consistency with the adjustment of a firearm provided the detective with a reasonable basis to suspect that [the defendant] was armed"). If they had, they should and would have yelled "gun" to alert their fellow officers in the car. *Jarvis*, 18-cr-475 (S.D.N.Y.) (PAC), ECF 24 at 4 ("if [the officer] really thought the waistband adjustment revealed that Jarvis was armed, he should have called out 'gun' to alert his co-officers to the dangerous situation.")

**Bulge or Object:** The government says it expects that at a hearing "at least one of the Officers would testify that they saw an object in the defendant's waistband prior to his seizure," but the record contains evidence to the contrary.

In the stop report, the arresting officer states that it was *after* Mr. Hardy stopped and raised out his arms and bag that he was "observed to have an object buldging [sic] outward from his waistband." Def. Exh. H at 2. Det. Joseph testified to the same. Def. Exh. A at 11:11-15 (*after* the police approach Mr. Hardy and he extends his arms, one of the officers saw a "bulge in the defendant's right-hand side" and "a dark object in the defendant's waistband."); *see also* Def. Exh. C at 00:55-56 (cannot see bulge).

Even, however, if the police had observed a "bulge" or "dark object" before Mr. Hardy was stopped, that would not have justified the stop. Observation of a generic "bulge" under a suspect's clothing, as opposed to one that has characteristics of a firearm, is usually insufficient to supply reasonable suspicion that the item underneath is contraband. *See Floyd v. City of N.Y.*, 959 F. Supp. 2d 540, 614 (S.D.N.Y. 2013) ("[T]he outline of a commonly carried object such as a wallet or cell phone does not justify a stop or frisk …"); *contrast U.S. v. Hagood*, 78 F.4th 570 (2d Cir. 2023) (defendant observed with fanny pack "in a manner not consistent with everyday wear" and that

5

appeared to have a "weighted" object as well as a "bulge" in the shape of a firearm); *U.S. v. Hawkins*, 37 F.4th 854 (2d Cir. 2022) (defendant observed with "bulge" in the shape of a gun following a shooting in the building from which defendant was exiting).

Additionally, in state grand jury proceedings, Officer McKenna, who is the one who made physical contact with Mr. Hardy, testified that he "see[s] the black handle of a firearm" only *after* Mr. Hardy had begun to run. Defense Exhibit M at 6:13-18. That testimony is reaffirmed by the still photos from the interaction with the police, where the officer who reached out to grab Mr. Hardy (Officer McKenna) is on Mr. Hardy's left, whereas the gun is recovered from Mr. Hardy's right side – which, based on the video and still photos, could not have been visible from Officer McKenna's perspective. *See Jarvis*, 18-cr-475 (S.D.N.Y.) (PAC), ECF 24 at 4-5 (suppressing in part because police testimony was not credible given observation position.); *U.S.* v. Mayo, 960 F. Supp. 2d 419, 422 (E.D.N.Y. 2013) (finding police testimony about observing gun handle lacked credibility in part because of defendant's clothing and his position with respect to the officers.)[6]

The NYPD arrest report, federal and state grand jury testimony and the body camera footage should convince this Court that no bulge part of an object resembling a firearm was observed prior to Mr. Hardy's flight.

**"High Crime Neighborhood":** The government argues that Mr. Hardy was observed in a "high crime area" and that this context justifies the stop, relying on *U.S. v. Weaver*, 9 F.4th 129 (2d Cir. 2021). In *Weaver* it was the defendant's series of "furtive" and suspicious acts, taken in context with several other facts surrounding the stop including that it had "occurred in a high-crime neighborhood" that justified the stop. *Id.* at 150. Not only can that term not be used "as a 'substitute

---

[6] While the officers may have had a "hunch" that Mr. Hardy was carrying a weapon, that is not a sufficient basis for the stop. *U.S. v. Strachon*, 354 F. Supp. 3d 476, 487 (S.D.N.Y. 2018) (granting suppression because court could "only conclude that [the officer] had nothing more than a hunch—a good, experienced cop's hunch—that something might be amiss. … As it turns out, his hunch was correct. But that is not the standard by which *Terry* stops are judged.")

for analysis' of the record," *id.*, here, the record does not even establish that Mr. Hardy was in a "high-crime neighborhood."

The officers stated only that they were patrolling the "area" (which they do not define) "because of recent shootings" (with no parameters on "recent") and (undefined) "violence." Gov. Opp. at 15; Def. Exh. B at ¶ 3(a). That description is too vague to warrant the intrusion of an investigatory stop. Is the "area" University Avenue? Morris Heights? The Bronx? How recent were the shootings? While an officer testified as to the "previous weeks and months" (Def. Exh. A at 7:4-5), was it two weeks or ten months or more? How many shootings? What time of day? Were they related to other criminal activity? If so, what was that? As to the violence, what type was it? Domestic assaults, gang-related, random assaults on strangers? Without more detail, this Court should not graft onto those statements a finding that Mr. Hardy was in a "high crime area."

Even if "recent shootings and violence in the area" can be a proxy for "high-crime neighborhood", such a finding, without attendant facts more suggestive of criminal behavior or of a person being armed and dangerous than found in this record, cannot justify the initial stop. As observed in the *Weaver* concurrence, relying on police testimony that a suspect was in a "high crime area" to justify a stop "will come dangerously close to declaring that persons in 'bad parts of town' enjoy second-class status in regard to the Fourth Amendment." *Id.* at 158 (internal quotation marks, citations and bracket omitted).[7]

To justify Mr. Hardy's initial stop (prior to his flight), the government relies on a series of inapposite cases. In *Williams*, the stop was justified when a defendant was observed "swaying back and forth," which provided "sufficient reason" for a stop to "determine, at the least, whether [the defendant] needed assistance due to intoxication or for some other reason." *U.S. v. Williams*, 526 F.

---

[7] Should a suppression decision turn at all on whether Mr. Hardy was in a "high crime area," this Court should order an evidentiary hearing to hear testimony on what specific facts support such a description, particularly when the officers did not include that description in their paperwork, despite its frequent use within the NYPD, especially in the context of investigatory stops.

App'x 29, 32 (2d Cir. 2013). Here, there is no evidence that the officers believed Mr. Hardy needed assistance or was in danger. In fact, by continuing to walk after the first time the police identified themselves, Mr. Hardy signaled he did *not* need help nor was he in danger.

Likewise, *Weaver* involved far more facts supporting the officers' reasonable belief that the defendant was armed and dangerous and therefore warranted the investigatory stop than the record here, including that:

- The defendant first gave a "noticeable 'upward tug' to his waistband";
- Second, during a traffic stop, the defendant was "slouch[ing] down" and "shift[ing] his hips" when the officer approached, appearing to be "trying to conceal something";
- Third, after the defendant was ordered out of the car, he stood "unusually close to the vehicle, pressing his pelvis only 'a few inches' from the quarter panel."

9 F.4th at 147. It was this *series* of "furtive" actions taken in context ("context is king in Fourth Amendment analysis"), including a backseat passenger quickly opening his door into traffic, the danger inherent in a traffic stop and an officer recognizing a passenger from a prior suspicious observation, as well as the police interaction occurring in a high-crime area, that all combined to establish a reasonable inference that the defendant "was on the lookout for police precisely because he was engaged in criminal activity that might include possession of a weapon." *Id.*

As a final matter, the government offers neither proof nor argument that at any point did the police have any reason to believe that Mr. Hardy was both armed *and* dangerous, as required for an investigative stop. *Michigan v. Long*, 463 U.S. 1032, 1034, 103 S.Ct. 3469, 3473 (1983) (*Terry* stop requires reasonable, articulable suspicion that individual "is armed and dangerous").

Though the government describes a "collision" between Mr. Hardy and one of the officers (Gov. Opp at 5, 19), perhaps to support a claim that he was dangerous, the video footage shows that, at most, there is an inadvertent collision after Mr. Hardy was chased by an NYPD officer. Def. Exh. D at 1:5-1:19. And while the government details Mr. Hardy's criminal history (Gov. Opp. at 4 fn 5), as the police did not know of his criminal history at the time, nor does the record contain evidence of

*any* criminal activity by Mr. Hardy other than gun possession, that detail is simply gratuitous. *U.S. v. Navedo*, 694 F.3d 463, 468 fn 6.

3. **In Light of *Bruen*, Possession of a Firearm, Without More, Does Not Supply Reasonable Suspicion *or* Probable Cause**

   While the government is correct that *Homer* concerned probable cause (Gov. Opp. at 12), in a decision on reconsideration, that Court detailed the jurisdictions that have analyzed how the Second Amendment may deprive law enforcement agents even of reasonable suspicion for an investigatory stop based on a belief that an individual is carrying a firearm. *U.S. v. Homer*, 23-cr86 (E.D.N.Y.) (NGG), ECF 68 at 7-9, 17.  Because New York is now a "shall issue" state, the previous presumption that public possession of a firearm suggests criminal activity and therefore supports reasonable suspicion may no longer be valid. *Id.* at 7, fn 6 (citing cases); *see also U.S. v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) ("Being a felon in possession of a firearm is not the default status. More importantly, where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention.")

   Furthermore, it was *solely* possession of a firearm that precipitated Mr. Hardy's ultimate arrest, and that was effectuated without the officers conducting any review to determine whether he was licensed to carry it or whether he was for some reason prohibited from possessing it.  As is clear under *Bruen* and the changes to New York's licensure regime, possession of a firearm, without more, is not probable cause to believe a crime was committed. *N.Y. State & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111 (2022).

4. **When the Police Held Mr. Hardy on the Ground and Handcuffed Him, they Effectuated an Arrest that was Unsupported by Probable Cause**

   When the police physically restrained and handcuffed Mr. Hardy, he was, at that point, effectively arrested and at the time the police did not have probable cause to believe he had committed a crime and thus any evidence seized in the post-arrest search must be suppressed.

9

While on the ground, officers surround Mr. Hardy for about 25 seconds before they put handcuffs on him. Def. Exh. D at 1:18-1:36. Then, after cuffing him, the officers waited about another 40 seconds before patting him down. *Id.* at 1:40-2:20. The relatively leisurely pace of those actions undermines the government's claim as to the danger they believed that Mr. Hardy posed. In addition to not identifying *any* crime (other than the instant possession of the hidden weapon) they suspected him of committing, they of course never charged him with any other crime. Indeed, his earlier actions, such as walking past two individuals instead of engaging with them, suggest that he posed no danger. And while the police could have run Mr. Hardy's name to see if he had a license to carry a firearm or was prohibited from doing so, which could have provided probable cause to arrest him, they chose not to do so. The facts here did not supply probable cause.

Even if the police had reasonable suspicion following Mr. Hardy's flight, at that point all they would have been permitted to perform would have been a brief *Terry* stop. Doing so would have been quick and limited the indignity of the intrusion. *See U.S. v. Bemacet*, 24 F.3d 269, 272 (2d Cir. 2013); *see also U.S. v. Homer*, 23-cr-86, E.D.N.Y. (NGG), ECF 53 at 14, ECF 68 at 29-30 (officers who had defendant on ground and cuffed for six seconds had arrested him). Instead, they physically restrained him, handcuffed him and searched down through his pants legs while he lay on the ground – and even once they retrieved a gun, they still did not have probable cause to arrest him, as they did not at that point know that his possession constituted a crime, nor did they believe he had committed any other crime. *see also United States v. Pena*, 351 F.Supp.3d 723, 731 (S.D.N.Y. 2019).

**5. Conclusion**

Based on the record here, this Court should suppress the firearm or order an evidentiary hearing given the detailed, specific and nonconjectural facts set forth in the defense papers that detail contested issues of fact.

Dated: New York, New York
June 18, 2025

      /s/ Megan Wolfe Benett
Megan Wolfe Benett, Esq.
485 Lexington Ave., 28th Floor
New York, NY 10017
(212) 973-3406
(212) 972-9432 (fax)
mbenett@kreindler.com
*Attorney for Defendant Shamel Hardy*

cc:    All Counsel of Record via ECF/CM

11